**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

MICHAEL P. TIERNEY,

        Plaintiff,

    -v-

OMNICOM GROUP INC.,

        Defendant.

--------------------------------------------------------x

No. 06 Civ. 14302 (LTS)(THK)

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  JUL 1 1 2007
```

## MEMORANDUM ORDER

In this action brought against Defendant Omnicom Group Inc., Plaintiff Michael

P. Tierney, in his Amended Complaint, raises several causes of action under New York common

law concerning stock options that Omnicom allegedly promised to him. The Court has diversity

jurisdiction of this action pursuant to 28 U.S.C. § 1332.

Defendant now moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure to dismiss Plaintiff's Amended Complaint in its entirety. The Court has thoroughly

considered all of the parties' submissions and written and oral arguments. For the following

reasons, Defendant's motion is granted in part and denied in part.


## BACKGROUND

The following facts, alleged in Plaintiff's Amended Complaint, are taken as true

for the purposes of the instant motion practice. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir.

1996). In mid-2000, Defendant Omnicom Group Inc. ("Omnicom" or "Defendant"), through its

Copies mailed + Picked up by Counsel
Chambers of Judge Swain
        7/11/07

Chief Executive Officer John Wren, asked Plaintiff Michael P. Tierney ("Tierney" or "Plaintiff") to manage some of Omnicom's investments in digital marketing companies (the "digital investments") as President of Communicade Management Company ("Communicade"), an Omnicom subsidiary responsible for managing those investments. (Am. Compl. ¶¶ 9-14.) On July 17, 2000, Wren and Tierney executed a term sheet (the "Employment Agreement") (id. ¶ 12) which provided, inter alia, that Tierney would become the President of Communicade and manage Omnicom's digital investments for a $450,000 base annual salary and stock options. The term of employment was fixed at three years. With regard to the stock options, the Employment Agreement stated: "Stock Options: Initial award upon joining of 10,000 shares; shares vest over three years. Additional awards based on performance." (Id. Ex. A.) Tierney commenced his work on October 1, 2000. (Id. ¶ 16.)

Omnicom thereafter executed three separate stock option agreements (the "Stock Option Agreements") with Tierney. (Am. Compl. ¶¶ 16-19.)[1] On October 2, 2000, Omnicom executed a Stock Option Agreement granting Tierney an option to purchase 10,000 shares at $73.625 per share. (Declaration of Christopher R. Harris in Supp. of Def.'s Mot. to Dismiss ("Harris Decl.") Ex. 1.) On February 2, 2001, Omnicom executed a Stock Option Agreement granting Tierney an option to purchase 15,000 shares at $87.160 per share. (Id. Ex. 2.) On April 4, 2001, Omnicom executed a Stock Option Agreement granting Tierney an option to purchase 15,000 shares at $79.500 per share. (Id. Ex. 3.) Aside from the grant date, the number of shares,

---

[1]     Although copies of the Stock Option Agreements were proffered by Defendant rather than Plaintiff, the Court may refer to these documents at the motion to dismiss stage because they are integral to Plaintiff's pleadings, I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991), and Plaintiff does not challenge their authenticity.

and the strike price, these Stock Option Agreements contained identical terms.[2]

The Stock Option Agreements each provided that in the event of "Involuntary Termination of Employment"[3] following the first anniversary of the stock option's grant date, the stock options would remain exercisable by Tierney for 36 months (three years) following the termination. (Stock Option Agreements § 3(b)(i).)  However, in the event of Tierney's voluntary termination of his employment, the stock options would be cancelled immediately.  (Id. § 3(b).)  The Stock Option Agreements defined "Termination of Employment" as the time "when the employee-employer relationship between the Employee and Omnicom or an Omnicom Subsidiary ceases to exist for any reason . . . ."  (Id. § 6(a).)  "Omnicom Subsidiary" was defined in the Omnicom Group Inc. 1998 Incentive Compensation Plan (explicitly incorporated by the Stock Option Agreements at § 1), as including "any entity that is organized as a limited liability company in which [Omnicom], directly or indirectly, possesses 50% or more of the voting power of all members of such limited liability company entitled to vote."  (Harris Decl. Ex. 4 § 2(t).)

The value of Communicade and its digital investments began to decline dramatically. As a result, Omnicom decided to form a limited liability company called Seneca Investments LLC ("Seneca"), which would take over the management of the digital investments. (Am. Compl. ¶¶ 20-22.)  In January 2001, Omnicom and Tierney began a series of oral exchanges in which both parties reaffirmed their commitments to the terms of the Employment

---

2       Exhibits 1, 2 and 3 to Defendant's Notice of Motion to Dismiss, which are reproductions of the three Stock Option Agreements, are hereinafter referenced to collectively as the "Stock Option Agreements."

3       "Involuntary Termination of Employment" meant a "Termination of Employment for a reason other than death, Retirement, Total Disability, voluntary resignation, or Termination of Employment for Cause." (Stock Option Agreements § 6(d).)

Agreement but also introduced some modifications reflecting more recent developments (the "Oral Modifications").  Omnicom repeatedly asked Tierney to carry out the "responsibilities specified in the [Employment] Agreement," but, in light of Omnicom's plan to save the digital investments through the creation of Seneca, Tierney was to continue his responsibilities as the eventual CEO of Seneca.  (Id. ¶ 27-28, 177.)  Omnicom assured Tierney that the "compensation terms specified under the [Employment] Agreement remained in effect" (Id. ¶ 30), but in acknowledgment of the specific stock option grants that had been made by that time, Omnicom also assured Tierney that "it would take any steps necessary to ensure that the [stock options] remained exercisable by [Tierney], or that it would provide [Tierney] their value."[4]  (Id. ¶¶ 30-31.)  Omnicom did not sign a new employment agreement with Tierney concerning his transfer to Seneca.  (Id. ¶ 41.)  On or about May 1, 2001,[5] Omnicom and two other entities, Pegasus E-Services Holdings LLC and Pegasus Partners II, L.P., executed an agreement to create Seneca

---

[4]   At oral argument, Plaintiff's counsel proffered that, under the alleged agreement to provide the value of the stock, Omnicom was to pay Plaintiff the value of the stock as of the time of the Seneca transition, calculated under the "Black-Scholes" valuation formula, in accordance with the eligibility and payment terms set forth in the Stock Option Agreements.  (Oral Argument Tr. 15-16.)

[5]   Plaintiff cites May 1, 2001, as Seneca's creation date and Plaintiff's commencement date at Seneca.  (Am. Compl. ¶¶ 94, 122, 172, 191, 227.)  However, the Seneca Formation Agreement and the Seneca Charter (Harris Decl. Ex. 5, 6), which are proffered by Defendant, explicitly refer to Seneca's creation date as being May 2, 2001.  The Court construes Plaintiff's allegations as true at this stage of litigation, the discrepancy is not material to this order's analysis, and Defendant has not argued that the Seneca Formation Agreement and the Seneca Charter are "integral to" Plaintiff's Amended Complaint.  See I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991) (construing the terms of a document proffered by the defendant as part of the plaintiff's complaint upon a motion to dismiss because it was "integral to" the complaint).  For these reasons, and also for the sake of simplicity, the Court will refer to Seneca's creation date as being May 1, 2001.

("Seneca Formation Agreement").[6] (Harris Decl. Ex. 5.) The agreement contained a Schedule 3.7 concerning the terms under which Tierney and certain others would be employed by Seneca. (Id.)

Seneca had two classes of stock: non-voting preferred stock and common stock, which had voting rights. (Harris Decl. Ex. 6 § 6(b).) Although Omnicom owned all of the non-voting preferred stock at all relevant times (Am. Compl. ¶ 119), Omnicom decided which entities would hold the common stock from May 1, 2001, to March 31, 2004. At some point before June 2002, Omnicom paid an entity, Pegasus Ventures, $6,000,000 in "management fees" to hold the Seneca common stock and serve as Omnicom's agent with respect to Seneca. (Id. ¶¶ 120-28.) After Pegasus Ventures acquired Seneca's common stock, Omnicom played an active role in managing transactions involving Agency.com, Organic, and LiveWeb, which turned out to be Seneca's most financially significant investments. Omnicom prepared all the term sheets and legal documentation, and it handled all substantive negotiations concerning these transactions. Meanwhile, Pegasus Ventures, the entity that held 100% of the voting stock of Seneca, had no involvement in these transactions whatsoever. (Id. ¶¶ 172-80.)

In June of 2002, Pegasus Ventures surrendered its common shares in Seneca and, for a period of time, Omnicom was Seneca's only shareholder. Omnicom then agreed to pay a company called Chaucer an unspecified amount of "management fees" to hold Seneca's common stock and serve as Omnicom's agent with respect to Seneca. Omnicom thereafter cancelled the agreement with Chaucer, resuming its role as Seneca's only shareholder. (Am. Compl. ¶¶ 130-

---

[6]     Technically, the Seneca Formation Agreement first creates an LLC called "Pegasus E-Services Investments LLC." That entity was to then be renamed "Seneca Investments LLC" promptly after closing. (Harris Decl. Ex. 5 § I.1.1.)

34.) There was no express provision in the Seneca Formation Agreement or the Seneca Charter concerning voting rights when the only shareholder of Seneca held only non-voting, preferred stock. (See Harris Decl. Ex. 5, 6.)

In the second half of 2002, Omnicom paid Tierney and Jerry Neumann, the Chief Financial Officer of Seneca and Communicade, a "bonus" of $250,000 so that they could purchase Seneca's common shares, which were valued at $250,000 at that time. (Id. ¶¶ 135-36.)

Tierney and Neumann formed a company called PGNT Management LLC ("PGNT"), with Tierney as the majority shareholder, to acquire Seneca's common shares. As the majority shareholder of PGNT, which in turn was the sole owner of Seneca's common shares, Tierney did not allow PGNT to take any actions with respect to Seneca of which Omnicom did not approve. (Id. ¶¶ 139-45.) On March 31, 2004, Omnicom converted its preferred stock in Seneca into a $24,000,000 Note and 40% of Seneca's common equity, then transferred the 40% equity interest to Wharton Business School. (Id. ¶¶ 218-22.)

The three-year term specified in the Employment Agreement between Omnicom and Tierney expired on October 1, 2003. (Am. Compl. ¶ 74.) At a time unspecified in the Amended Complaint, Omnicom told Tierney that it would not renew the Employment Agreement because Tierney's continued work for Omnicom in any capacity would hurt Omnicom's position in a separate securities litigation. (Id. ¶¶ 73, 75.) Nonetheless, Omnicom continued paying Tierney the same salary and provided him the same benefits as had been provided prior to the formation of Seneca until March 31, 2004 (Id. ¶ 63), when Omnicom and Tierney's employer-employee relationship finally ended. (Id. ¶ 109.)

On November 8, 2006, Tierney sent a notice to Omnicom formally exercising the

October 2, 2000, and February 2, 2001, stock options and, on January 23, 2007, Tierney sent a notice to Omnicom formally exercising the April 4, 2001, stock options. Omnicom refused to recognize Tierney's attempts to exercise the options or pay their cashless exercise value. (Id. ¶¶ 97-106.)

Plaintiff asserts ten causes of action arising under New York common law, including multiple breach of contract claims, multiple claims of breach of the implied covenant of good faith and fair dealing, and claims of quantum meruit, unjust enrichment, and promissory estoppel. Plaintiff additionally invokes the doctrines of waiver, estoppel, unclean hands, and specific performance as causes of action.

## DISCUSSION

In evaluating a motion to dismiss a pleading pursuant to Rule 12(b)(6), the Court must take as true the facts alleged in the claimant's pleading and draw all reasonable inferences in his favor. W. Mohegan Tribe & Nation v. Orange County, 395 F.3d 18, 20 (2d Cir. 2004); Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994). The recent U.S. Supreme Court decision in Bell Atlantic Co. v. Twombly, 127 S.Ct. 1955 (2007), and a Second Circuit decision, Iqbal v. Hasty, No. 05-5768-CV (L), 2007 WL 1717803 (2d Cir. June 14, 2007), which interprets and applies Twombly, indicate that, at least where the facts alleged in the challenged pleading are ambiguous as to whether the conduct alleged is sufficient to warrant a finding of culpability, the determination as to whether a pleading articulates facts sufficient to state a claim upon which relief may be granted includes an assessment as to whether sufficient facts are alleged to make the plaintiff's allegations of wrongdoing "plausible."

Whether Plaintiff's Allegations are "Well-Pleaded" or "Plausible"

Defendant argues that the entire Amended Complaint should be dismissed because it is not "well-pleaded." While a court must deem the plaintiff's allegations to be true on a motion to dismiss, "the standard to govern the sufficiency of the complaint presumes 'well-pleaded' allegations, and it is only those pleadings the courts are charged to deem true." Rieger v. Drabinsky, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001).

> Thus, a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice.

Id. at 405-06. Rule 201(b) of the Federal Rules of Evidence provides that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." A court may take judicial notice of public records in deciding a motion to dismiss. See, e.g., Blue Tree Hotel Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004); Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("[t]he practice of taking judicial notice of public documents is not new").

Defendant argues the Court should take judicial notice of certain prior statements by Plaintiff that are reflected in publicly-filed documents. These prior statements purportedly establish that Plaintiff's employment relationship with Omnicom ceased in May 2001. (See Harris Decl. Ex. 8-10.) Defendant argues that Plaintiff's allegations that he worked for Omnicom until March 31, 2004, are not "well-pleaded" because they are contradicted by these earlier statements.

Prior inconsistent statements, while material to credibility, are not the proper subject matter of judicial notice.  Furthermore, given Plaintiff's allegations of an overall corporate strategy of keeping the Seneca business "off the books" as far as Omnicom was concerned, and his specific allegations regarding disguised agency arrangements relating to voting power, statements he made while acting as president of Seneca would not at this stage be an appropriate basis for making a definitive finding as to the nature or status of his relationship to the Omnicom group at this stage of the litigation.

Defendant further argues that Plaintiff's allegations that he worked for Omnicom until March 31, 2004, are not "well-pleaded" because they are also contradicted by other allegations in Plaintiff's own complaint.  See Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1095 (2d Cir. 1995) (affirming dismissal of complaint where "attenuated allegations" supporting a claim were "contradicted by more specific allegations in the complaint"); Rieger v. Dabrinsky, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("a court need not feel constrained to accept as truth conflicting pleadings that . . . are contradicted . . . by statements in the complaint itself").  Defendant argues that allegations in the Amended Complaint which describe Plaintiff as working for Seneca after May 1, 2001, contradict other allegations in the Amended Complaint that describe Plaintiff as working for Omnicom after May 1, 2001.  (See, e.g., Am. Compl. ¶¶ 10, 33, 62, 163, 177.)  However, the gravamen of Plaintiff's employment status allegations is the contention that Omnicom's actions blurred the line between Seneca and Omnicom, so those cited allegations are not necessarily contradictory.  Therefore, the Court finds that Plaintiff's allegations that he worked for Omnicom until March 31, 2004 to be sufficiently "well-pleaded" to be construed as true for purposes of this motion practice.

Defendant also argues that the prior statements and the allegedly contradictory allegations in the Amended Complaint render Plaintiff's allegations that he worked for Omnicom until March 31, 2004, implausible under Twombly, and that the Amended Complaint should accordingly be dismissed. See Iqbal, 2007 WL 1717803, at *11 (Twombly "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible"). However, Plaintiff's allegations of an employment relationship with Omnicom through March 31, 2004, and his concurrent allegations that he also worked for Seneca through March 31, 2004, are sufficiently plausible to the extent that the Twombly standard is applicable in this factual context, because of Plaintiff's specific factual allegations regarding Omnicom's disguised agency relationships with controlling shareholders of Seneca. Accordingly, the Court denies Defendant's motion to dismiss the Plaintiff's Amended Complaint in its entirety as not well pleaded or as implausible.

The Court now considers, in turn, Defendant's arguments for the dismissal of each cause of action asserted in the Amended Complaint.

First Cause of Action: Breach of the Employment Agreement

Plaintiff claims that Defendant breached the Employment Agreement by refusing to honor Plaintiff's exercise of the stock options. In moving to dismiss this claim, Defendant argues that the option provision of the Employment Agreement is too indefinite to support a contract claim. Under New York law, a court must determine whether a contract claim is based on "a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract." Express Indus. and Terminal Corp. v. N.Y. State Dep't of Transp., 93

N.Y.2d 584, 589 (N.Y. 1999). "[D]efiniteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do." <u>Martin, Delicatessen, Inc v. Schumacher,</u> 52 N.Y.2d 105, 109 (N.Y. 1981).

   The stock option provision of the Employment Agreement reads in its entirety as follows: "<u>Stock Options</u>: Initial award upon joining of 10,000 shares; shares vest over three years. Additional awards based on performance." (Am. Compl. Ex. A.) The strike price, a critical element of any stock option, of the initial award is not identified. The Employment Agreement does not address what kind of performance was intended to merit additional awards, when the additional awards would be given, how many shares would be granted, or what their strike prices would be. Therefore, putting aside the question of whether any other elements of the Employment Agreement are sufficiently definite as to be enforceable in a contract action, the option provision is clearly insufficient to support an action for breach of contract and the First Cause of Action will be dismissed.

## Second Cause of Action: Breach of the Employment Agreement as Modified by the Oral Modifications

   Plaintiff claims that Defendant breached the Employment Agreement, as modified by the Oral Modifications, by refusing to honor Plaintiff's exercise of the stock options or, alternatively, by refusing to pay Plaintiff the value of those stock options as orally promised. This Second Cause of Action is premised on allegations that, in connection with Plaintiff's transition to Seneca, Plaintiff and Omnicom entered into an oral agreement to continue all of their respective rights and obligations under the three-year Employment Agreement, and that, as part of those Oral Modifications, Omnicom agreed to provide Plaintiff with payments equivalent

to the value of any stock options that might not otherwise be exercisable by virtue of the shift to

Seneca. The stock option element of this Oral Modification claim does not fail for definiteness

in that the specific grant dates, numbers of shares, and strike prices of the three sets of stock

options had already been determined. (See Am. Compl. ¶ 16, 31.) However, the Second Cause

of Action fails as plead because the alleged Oral Modifications run afoul of the statute of frauds.

Under the New York statute of frauds:

> Every agreement, promise or undertaking is void, unless it or some note or
> memorandum thereof be in writing, and subscribed by the party to be charged
> therewith, or by his lawful agent, if such agreement promise or undertaking: 1)
> By its terms is not to be performed within one year from the making thereof . . .

N.Y. Gen. Oblig. Law § 5-701(a) (McKinney 2001 & Supp. 2007). If there is any possibility that

the oral agreement, according to the parties' terms, can be performed within one year, the oral

agreement does not need to be memorialized in writing to be enforceable. D & N Boening, Inc.

v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 455 (N.Y. 1984). Here, the alleged Oral Modifications

were part and parcel of an agreement that was, by its terms, to be performed over a three-year

period. Such an agreement fails to satisfy the documentation requirement of the statute of frauds.

Plaintiff's argument that he has alleged facts sufficient to support a finding of enforceability by

reason of part performance also fails, in that the facts alleged in the complaint are insufficient to

support a finding that the parties' actions following the alleged Oral Modifications are

"unequivocally referable" to the existence of such an oral agreement. See Anostario v.

Vicinanzo, 450 N.E.2d 215, 216 (N.Y. 1983). Accordingly, the Second Cause of Action, as

plead in the Amended Complaint, will be dismissed.

    At oral argument, Plaintiff appeared to advance a somewhat different theory –

that Omnicom had agreed at the time of the transition to pay him the then-value of the stock

options, at the times and pursuant to the conditions under which they would have been payable

had his Seneca employment been Omnicom employment. Because it appears possible that such

an agreement could have been performed within one year, the Court will grant Plaintiff leave to

amend the Oral Modification claim to allege such facts.


Third Cause of Action: Breach of Implied Covenant of Good Faith and Fair Dealing under the
Employment Agreement and Oral Modifications

Plaintiff claims Defendant breached the implied covenant of good faith and fair

dealing under the Employment Agreement (this claim is asserted as to the original agreement and

as to the allegedly modified agreement) by refusing to honor Plaintiff's exercise of the stock

options promised in the Employment Agreement. An implied covenant of good faith and fair

dealing is implied in every contract governed by New York law, and it precludes each party from

engaging in conduct that will deprive the other party of the benefits of their agreement.

Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir. 1989).

The following rule precludes a good faith and fair dealing claim in this case:

if the allegations do not go beyond the statement of a mere contract breach and,
relying on the same alleged acts, simply seek the same damages or other relief
already claims in a companion contract cause of action, they may be disregarded
as superfluous as no additional claim is actually stated.

Hall v. EarthLink Network, Inc., 396 F.3d 500, 508 (2d Cir. 2005). In this case, Plaintiff's Third

Cause of Action is based on precisely the same factual allegations as those supporting his breach

of Employment Agreement claim. The Amended Complaint alleges no additional facts, nor does

it highlight or distinguish any particular facts when making this good faith and fair dealing claim.

On the contrary, it "repeats and realleges each and every allegation of the preceding paragraphs." (Am. Compl. ¶ 264.) Therefore, Defendant's motion to dismiss is granted as to this cause of action.

## Fourth Cause of Action: Breach of Stock Option Agreements

Plaintiff claims that Defendant breached the Stock Option Agreements by refusing to honor Plaintiff's exercise of the stock options as promised in the Stock Option Agreements. Defendant's argument for dismissal of this cause of action rests primarily on two contentions.

Defendant first argues that Plaintiff's employment with "Omnicom or an Omnicom Subsidiary" was terminated when he transferred to Seneca on May 1, 2001, and that Seneca was not an "Omnicom Subsidiary" as defined by the Stock Option Agreements. Under this theory, Plaintiff's stock options would have expired on May 1, 2001. According to the Stock Option Agreements, a termination of the employment relationship immediately cancels the stock options, with exceptions provided only in cases where termination occurs after the first anniversary of the grant date. (Stock Option Agreements § 3(b).) The grant dates of the three stock options were October 2, 2000, February 2, 2001, and April 4, 2001, so a termination on May 1, 2001, would have occurred before the first anniversary of any of these stock options' grant dates, and Plaintiff's attempts to exercise the stock options in November 2006 and January 2007 would have been ineffective.

However, Plaintiff's allegations, taken as true for purposes of this motion to dismiss, are sufficient to support Plaintiff's claim that he continued in a covered employment

relationship with Omnicom or an Omnicom Subsidiary following the creation of, and his

transition to, Seneca in May 1, 2001.  Plaintiff alleges in the Amended Complaint that he was

treated as an Omnicom employee for payroll purposes and that he continued to report to

Omnicom following the Seneca transition. (Am. Compl. ¶¶ 62-70.)  Moreover, the Amended

Complaint proffers extensive allegations concerning Omicom's legal ability to control

fundamental corporate activities of Seneca and its practical (albeit indirect) voting control over

Seneca at all relevant times through agency relationships with the entities that held Seneca's

voting stock during the relevant period, as well as during the periods in which Omnicom was

Seneca's sole shareholder.  (Id. ¶¶ 118-247.)

   Defendant next argues that, even if Plaintiff's employment with Omnicom or an

Omnicom Subsidiary is deemed to have continued through March 31, 2004, Plaintiff has not

plead sufficient facts to raise a plausible claim that he was terminated involuntarily and thus had

the right to exercise the outstanding options for a period of three years following the termination

of his employment (see Stock Option Agreements § 3(b)).

   Dismissal of this Fourth Cause of Action as currently plead is appropriate.

Although the Amended Complaint repeatedly describes Plaintiff's term of employment as ending

on March 31, 2004 (Am. Compl. ¶¶ 10, 63, 64, 76, 79, 109), there is no allegation that Plaintiff

was terminated involuntarily.  At oral argument, when Plaintiff's attorney was pressed on this

point, he proffered that when Omnicom restructured its investment in Seneca on March 31, 2004,

Omnicom "unilaterally stopped paying Mr. Tierney," and requested permission to amend the

Amended Complaint to present facts supporting this theory of involuntary termination.  (June 25,

2007 Oral Argument Tr. 11.)  Defendant's motion to dismiss is granted as to Plaintiff's Fourth

Cause of Action, without prejudice to repleading to assert facts supporting a claim of involuntary termination.

## Fifth Cause of Action: Breach of Implied Covenant of Good Faith and Fair Dealing under the Stock Option Agreements

Plaintiff claims that Defendant breached the implied covenant of good faith and fair dealing under the Stock Option Agreements by refusing to honor Plaintiff's exercise of the stock options as promised in the Stock Option Agreements. Defendant's motion to dismiss this cause of action is granted for substantially the same reasons explained above in connection with Plaintiff's Third Cause of Action.

## Sixth and Seventh Causes of Action: Quantum Meruit and Unjust Enrichment

Plaintiff's sixth and seventh claims are quasi-contract claims, and they may be considered together for purposes of this motion practice. Plaintiff's Sixth Cause of Action is a claim in quantum meruit, alleging that Plaintiff rendered substantial services to Defendant from October 1, 2000, to March 31, 2004, and that Defendant did not pay Plaintiff the reasonable value of his services. Plaintiff claims that, because he was prevented from exercising his stock options, he was essentially paid approximately $1,000,000 less than the reasonable value of his services. Plaintiff's Seventh Cause of Action is an unjust enrichment claim, in which Plaintiff asserts that he rendered services to Defendant at Plaintiff's expense, and that, while Plaintiff received compensation, equity and good conscience require an additional payment to Plaintiff of $1,000,000, an amount which approximates the value of the unexercised stock options.

The quasi-contractual theory of quantum meruit requires the claimant to show:

(1) performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services. Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc., 171 A.D.2d 479, 484 (N.Y. App. Div. 1st Dep't 1991). The quasi-contractual theory of unjust enrichment requires the claimant to show "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006). Both causes of action are subject, however, to the following rule: "It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." Beth Israel, 448 F.3d at 587 (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (N.Y. 1987)).

Defendant argues that Schedule 3.7 of the Seneca Formation Agreement, executed on May 1, 2001, covers the scope of Plaintiff's quasi-contract claims concerning his employment after the Seneca transition because it explicitly names Tierney and describes the terms of his anticipated employment with Seneca. However, because Tierney was not a signatory of the Seneca Formation Agreement, Schedule 3.7 does not "clearly cover" the dispute between Tierney and Omnicom. Therefore, Defendant's motion to dismiss is denied as to Plaintiff's quantum meruit and unjust enrichment claims.

## Eighth Cause of Action: Promissory Estoppel

Plaintiff asserts a promissory estoppel claim, alleging that in early 2001, after Defendant had promised Plaintiff that his stock options would not be adversely affected by his transfer to Seneca, Plaintiff relied on that promise by agreeing to transfer to Seneca. Therefore, Plaintiff argues, promissory estoppel prevents Defendant from refusing to honor Plaintiff's exercise of his stock options. A claim of promissory estoppel requires the plaintiff to establish three elements: "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance." Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000). In seeking the dismissal of the promissory estoppel claim, Defendant again invokes the rule against quasi-contractual recovery where an express contract fully covers the subject matter. See Brown v. Brown, 12 A.D.3d 176, 176 (N.Y. App. Div. 1st Dep't 2004) (applying Clark-Fitzpatrick rule to promissory estoppel claim); but see Hubbard v. Town of Sand Lake, 246 A.D.2d 708, 710 (N.Y. App. Div. 3rd Dep't 1998) (applying Clark-Fitzpatrick rule to other quasi-contract claims but not promissory estoppel claim). For the reasons explained in connection with the Sixth and Seventh Causes of Action, dismissal on this ground is not appropriate at the pleading stage.

Defendant further argues that Plaintiff's allegations are insufficient to establish a "clear and unambiguous promise," because Plaintiff only refers to "promises" or "representations" generally without any specification. See Ward v. N.Y. Univ., No. 99 Civ. 8733 (RCC), 2000 WL 1448641, at *6 (S.D.N.Y. Sept. 28, 2000) (mere reference to "promises or representations," without more, is insufficient to plead promissory estoppel claim). However, Defendant mischaracterizes Plaintiff's allegations. Plaintiff alleges, inter alia, that "Omnicom specifically promised Plaintiff that it would take any steps necessary to ensure that the Options

remained exercisable by Plaintiff, or that it would provide Plaintiff their value." (Am. Compl. ¶

31.) The Amended Complaint defines "Options" in ¶ 16, which states:

> Pursuant to the [Employment] Agreement, Omnicom issued to Plaintiff the
> following stock options (the "Options"):

| Grant Date | No. of Shares | Strike Price |
|---|---|---|
| October 2, 2000 | 10,000 | $73.625 |
| February 2, 2001 | 15,000 | $87.160 |
| April 4, 2001 | 15,000 | $79.500 |

(Id. ¶ 16.) This level of specificity is sufficient to allege a clear and unambiguous promise.

Defendant's motion to dismiss is therefore denied as to this claim.


Ninth and Tenth[7] Causes of Action: Waiver, Estoppel, Unclean Hands, and Specific Performance

Plaintiff's remaining causes of action invoke the doctrines of waiver, estoppel,

unclean hands, and specific performance. Defendant is correct in arguing that none of these

doctrines are actually causes of action. Waiver, estoppel, and unclean hands are affirmative

defenses. See, e.g., Fed. Deposit Ins. Corp. v. Bernstein, 944 F.2d 101, 105 (2d Cir. 1991); U.S.

v. Bedford Assocs., 657 F.2d 1300, 1303 (2d Cir. 1981). Specific performance is a remedy, and

a remedy itself cannot be a cause of action. Hi Pockets, Inc. v. Music Conservatory of

Westchester, Inc., 192 F. Supp. 2d 143, 160 (S.D.N.Y. 2002). Therefore, Defendant's motion to

dismiss Plaintiff's claims based on waiver, estoppel, and unclean hands is granted, but without

prejudice to Plaintiff's appropriate use of these doctrines in the course of this litigation, and

Defendant's motion to dismiss Plaintiff's claim of specific performance is granted without

---

[7]     Plaintiff erroneously labels these causes of action as his Eighth and Ninth Causes of
Action.

prejudice to Plaintiff's ability to request the remedy of specific performance in connection with any of his other surviving claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's Amended Complaint is granted as to the breach of the Employment Agreement claim (First Cause of Action); the breach of the Employment Agreement and Oral Modifications claim (Second Cause of Action); the breach of the implied covenant of good faith and fair dealing claims (Third and Fifth Causes of Action); the breach of the Stock Option Agreements claim (Fourth Cause of Action); and the waiver, estoppel, unclean hands and specific performance claims (Eighth and Ninth Causes of Action)[8]; and is denied in all other respects.

Plaintiff shall serve and file any Second Amended Complaint within 14 days from the date of this Memorandum Order.

Plaintiff is granted leave to replead his Second and Fourth Causes of Action in a manner consistent with the foregoing discussion, and nothing in this decision bars Plaintiff from asserting the doctrines of waiver, estoppel, and unclean hands, or from seeking the remedy of specific performance, in an appropriate manner in the course of this litigation.

The parties shall promptly meet with Magistrate Judge Katz, to whom this case is now referred for general pretrial management purposes, to discuss settlement. Any disputes as to the scope of discovery, as well as all other nondispositive pre-trial matters, shall also be taken

---

[8]     So denominated in Amended Complaint, but actually the Ninth and Tenth Causes of Action therein asserted.

up with Judge Katz.

SO ORDERED.

Dated:   New York, New York
         July 11, 2007

LAURA TAYLOR SWAIN
United States District Judge